In this reexamination, the rulings of the Board exceed its jurisdiction and will greatly diminish the effectiveness of the VTO and the value of its issued patents. This jurisdiction is limited by 35 U.S. Codes, sections 302-304, to substantial new questions of valuability. The Board held that it is not bound by the rulings of prior examiners and is not bound by the rulings of prior Boards. The present Board overruled these prior rulings, including, among other things, first, seven rulings by two prior Board panels and the original examiner that the effective filing date for this invention is 1982. Secondly, five of these prior rulings further held that the very same 1988 OS II publications now relied upon by the present Board cannot be relied upon or considered because they are later than the 1982 effective filing date. And third, there was an allowance of 36 claims, each recited, that the editor and compiler execute concurrently, and they are located in the same program. The Director abandoned the Board's position and admitted at page 25 of his brief that section 303, quote, bars reconsideration of any argument already decided by the VTO. Instead, the Director raises a new argument, contrary to the Director's quotation from Ingrid Watts, that the VTO is, quote, barred from raising new arguments on appeal. This new argument is that Reiffen urged the reexamination examiner to, quote, adhere to the previous VTO rulings and implies that Reiffen thereby waived the lack of jurisdiction. Furthermore, this Court made clear in Dubose v. USPTO that subject matter jurisdiction cannot be waived no matter what the parties may say about it. The Board admits that the detailed description of all four of Reiffen's Under section 120, a later application with structure and operation identical to an earlier co-pending application is entitled to the earlier filing date. The Director relies on the addition to the 603 and 604 patents of the newly coined term, quote, multithreading. The Director disregards a held citation of Schering v. Angen, which held that the adoption of a newly coined name does not change the invention where only the terminology is changed. Well, that's then the question on this appeal, or at least one of the questions, correct? That may be. Whether or not the definition did change. As stated in Phillips v. AWH, quote, often the invention is novel and words do not exist to describe it. That is certainly the case with the word multithreading. There is only one new question of patentability now raised by the PTO. It resides in the Board's requirement that the editor be interrupted. Interruptible, I think. Pardon? Interrupted. I understood the Board's position to be interruptible. I believe you are correct, yes. Interruptible. I regard them as synonymous for reasons which we'll see. The Board's claimed construction was that the, quote, ordinary meaning of preemptive multithreading requires that the editor be interrupted. The Board repeated this ordinary criterion more than 50 times. An interruptible editor is not ordinary. It is so extraordinary that it is a nonexistent fiction. It is undisputed that during 27 years of prosecution of this invention and litigation of this invention before this Court, five Board panels, four examiners, and the District Court, and numerous motions by two of defendants' law firms, no one has discovered even a single instance of an interruptible editor. It is undisputed that the interactive threads in the Board's own cited references are not interrupted, but instead retain control of the CPU until they voluntarily, quote, release that control. Interactive threads are not interrupted because, among other reasons set forth in our brief, I will now rely only on what is in the literature relied upon by the Board. First, their speed is essential. Young, at 464, referring to the appendix, discloses that a thread which processes incoming characters is, quote, time critical, and, quote, must process these characters rapidly. Letwin, at 460, discloses that a process interacting with the keyboard requires, quote, the fastest possible response. Teitel, at 456, discloses that, quote, it is important to keep the interactive process service at top speed. Once you interrupt a thread, this speed disappears because you must save the context of the interrupted thread, which may involve moving a whole bunch of registers off into another location, and then when the preempting thread is over, you have to move the context back into the registers where you took them from, and the whole thing takes time. The Board argues that these interactive threads, although not interrupted, are nevertheless, quote, interruptible because allegedly there are time critical threads having a higher priority. This is contrary to the Board's Young Treatise, which discloses at 463 that interactive programs, quote, run at the highest priority level. Not only is the interrupted editor a nonexistent fiction, but the Board admitted that it is inconsistent with the Rypan specification, which discloses that the editor is not interruptible, and therefore the Board's claim construction is contrary to Phillips v. AWH. Now, there is only one reference upon which the Board relies, and that is for the rejections, that is, and that is the reference to Cross. The Board erroneously held that after each keystroke, Rypan's editor is, quote, finished, and therefore there is no concurrency. In the sole example of multithreading in the primary Cross reference, there is a keyboard input thread which is not interrupted, and which, quote, completes after each keystroke. The director's brief at page 42 correctly treats finishes and completes as synonymous. If the Board is correct that all interactive threads must be interrupted, and may not, quote, finish, or, quote, complete after each keystroke, then Cross does not disclose multithreading, and the Board's 102 and 103 rejections have no basis. The Board's contentions that Rypan's editor and compiler are not executed concurrently. Let me ask you a question about that. Now, Cross refers at one point to multiple threads having the same priority, right? I'm reading from A103, there's a reference to Cross. That may be, yes. Right, and it says with respect to threads having the same priority that OS2 time slices between the threads, and goes on to say, when time slicing, the operating system allows each thread to execute a specified amount of time. This is round-robin scheduling and allows multiple threads to have the same priority to share the process. Now, that sounds like a description of what the Board construed the definition of multithreading to be. That may be, but the criterion is what is ordinary, and Cross discloses one example of multithreading, and that one example does not correspond to the Board's version of ordinary, because in that... But you would agree that what I just read does describe what the Board construed multithreading in the context of this patent to be? Yes. Okay. Mr. Riefen, you want to save your rebuttal time? Am I that far gone? Yes, you're ready to rebuttal now. All right, I'll end it here and resume the rebuttal. Mr. Wood? May it please the Court. Mr. Riefen raises a lot of points, and I'm not sure I'll be able to get to all of them, but I'll certainly make that attempt. But let me start with the issue of jurisdiction. There is a substantial question of patentability here, Your Honors. And that substantial question is whether or not Kranz, along with other OST references, anticipates the claims of the 604 patent. Up until the opening brief in this appeal, Mr. Riefen never argued that Kranz disclosed all of the limitations of the claims of the 604 patent. So the issue, the substantial new question, was essentially the threshold question, whether or not Kranz was prior art and whether or not the 1982 application adequately disclosed the claims of the 604 patent. That particular question was not addressed in the original examination. As this Court has recognized, it is normal PTO procedure to accept an applicant's claim to an earlier effective filing date without analyzing whether the earlier filed claim adequately discloses under Section 112 the claims in the later filed application, unless the earlier date is needed. Under those circumstances, the examiner merely ensures that the formal requirements of Section 120 are met, that the earlier and later filed applications are co-pending, there's at least one common inventor, and so forth. Therefore, it cannot be assumed when the examiner or the Board states that the effective filing date is 1982 that anyone ever resolved or analyzed whether that earlier application adequately disclosed under 112 the later filed claims. Mr. Riefen would have to show that that particular issue was actually evaluated, and he cannot in this case show that. If you look at the cover page of the 604 patent, and that is at A350, you will see that there are no references dated after 1982. So the earlier effective filing date was not needed to overcome any references that were being evaluated by the examiner. It's only, as Mr. Riefen recognized in initiating this re-examination, it's only now that Kranz and the other OST references have come to light. Well, before your time runs out, let me get to, I mean, I know there are a lot of issues and a lot of questions. The main thing, we're looking here as to whether or not the disclosure, particularly the definition of multi-threading that was included in the 604, was something more different than the 82 disclosure? Is that really the essence of it? Yes, sure. And at least one of the, part of that question is answered, is it not, by whether or not the editor is interrupted or interruptible? Is that one of the key questions to determining the differences between 604 and the 1982 application? The fact that the editor disclosed in 1982 is not interruptible is undisputed. Yes. It's absolutely undisputed. So what is the disputed with respect to the 604 disclosure? Whether multi-threading, the term multi-threading, which is not restricted to editor. Mr. Riefen's briefs and his oral argument tie editor to multi-threading, but multi-threading is not restricted to an editor. It could be, multi-threading can be used in a whole host of applications that would not necessarily involve an editing function. So the board construed the disclosure in 604 to be broader than the 1982 disclosure. How, with respect to multithreading? Well, the board went a step further and correctly stated that what was disclosed, the real-time compiler embodiment disclosed in 1982 could not be multi-threading at all. It could not, as a matter of fact, it cannot perform the method that is claimed in Representative Claim 1. Well, that's one of the problems I have with the way he briefed the case. Representative Claim 1, which you put on the inside of your front cover and you talk about in the facts and you talk about again in the argument, doesn't seem to be before us. And if you look at Representative Claim 1, it does have pretty restrictive language, which you exploit in your argument, but 10 doesn't have much of that same language, right? Neither does 14, correct? And those are the two claims that struck me as being necessary for us to focus on, since 1 is not before us and 10 and 14 are, correct? Mr. Riefen never argued the separate patentability of Claims 10 and 14 before the board. It never challenged the board's, well, let me just leave it at that. It never argued the separate patentability of Claims 10 and 14 before the board. So you think he's waived the argument that Claim 1, that the limitations in Claim 1 should not be read into Claims 10 and 14?  As a matter of fact, even in his briefs on appeal, he did not set forth why Claims 10 and 14 should be patentable or separately patentable from Claim 1. Well, he thinks Claim 1 is patentable as well. I mean, it's not in his interest to argue that one is not patentable than the other is. But I think anyone who reads the claims can see that there's a significant difference, one which makes your argument with respect to 1 easier than your argument with respect to 10 and 14. Wouldn't you agree with me on that? Well, Your Honor, the board did not have the chance to look at Claims 10 and 14, so the record is really not clear as to the separate patentability of 10 and 14. And as I indicated earlier, it wasn't until the opening brief in this appeal that Mr. Rypen even alleged, without showing why, that Claims 10 and 14 or any of the other claims might be separately patentable over Claim 1. Let me ask you another question while I've got your argument interrupted. You focus a lot of your attention, as does the board, on the material between Columns 26 and 44, which is the definition of multi-threading. Well, I think Mr. Rypen might quibble with my use of the word definition. But anyway, that refers to multi-threading. The immediately following paragraph also refers to multi-threading. I take it that that immediately following paragraph also was newly added in the 94 application, was not in some substance in the 82 application. Is that correct? I'm sorry, which specific paragraph? The paragraph that goes from Column 140, Line 45, to Column 1, Line 53. That's correct. That paragraph was not in the 1982 application. All right. And so you would say that anything in that paragraph that would tend to support the restrictive view of the definition of multi-threading, i.e., that at least two of the threads must be interruptible, would support the board's conclusion that this definition is, A, restrictive, and B, inconsistent with the description in the 82 of editor-component. That's absolutely right, Your Honor. And that raises another point about the separate patentability of the claims. All of the claims are drawn to multi-threading. As a matter of fact, premium... But that has to be your... I mean, that's really the key thread in your argument, right? That it's the definition of multi-threading in that passage that locks all of the claims into the multiple interruptible threads concept. Correct? In the passage in that particular paragraph? Right. In other words, the definition of multi-threading is really, if you didn't have that, you'd have a much harder time, it seems to me, in arguing that the claims, again, such as 10 and 14, whatever one said, that those other claims are restricted in the way that you say they are by virtue of that definition. So this entire case really turns on those two paragraphs of the definition, doesn't it? Well, I think that is another argument why all of the multi-threading claims are different than the embodiment, the 1982 embodiment, because they all claim preemptive multi-threading, time-sliced preemptive multi-threading, which based on the portion of the specification that you pointed out, and also including the specific definition starting at line 27, they all require a plurality of interruptible threads. And the 1982 embodiment does not have a plurality of interruptible threads. Why are we so clear on that conclusion? Why can't we construe, at least looking at the first paragraph, that paragraph to suggest that the compiler is interrupted, but that the editor is not interrupted or interruptible? Well, it's just not disputed, Your Honor. What's not disputed? That the editor is not interruptible. No, no, we know that. But let me also make clear. The question is, isn't it your position that in this paragraph, in the definition of multi-threading, all threads are interrupted? That's right. Including the editor. And he says that's not what that paragraph says. That's correct. So that's where the heart of the dispute is in this case. I have the same question as Judge Post. What is it in this paragraph, what's something in this paragraph that is the conclusive answer, as far as you're concerned, to the argument that all that's required is that one of the threads be interrupted? Well, I just want to take a step back and make sure the Court is comfortable with the fact that multi-threading is not compiling editing. It's a broad term that is not tied to that specific... Sure, but the question is, is compiling and editing, as described in 82, a form of multi-threading, as multi-threading is defined here? If multi-threading, as defined here, can fairly be construed to apply to a system that has one interruptible thread and another thread that executes to conclusion, then he's got a point. But what I'm looking to you for is something in this paragraph that you regard as the most conclusive reason for us to believe that multi-threading should be defined restrictively to require at least two interruptible threads. Well, there are a number of words that go to that, Your Honor. It's, again, that multi-threading is specifically defined to mean concurrent, asynchronous, pre-emptive, time-sliced execution of a plurality of threads, time-sliced execution of a plurality of threads. That time-sliced execution, as the board made clear, based on a review of references that discuss multi-threading in general, means that at the end of a time-slice, the thread has to stop executing and give control of the CPU to a different thread. And so a plurality of threads must be able to do that if they are to execute in a time-sliced manner. The other thing is that Ryphon made clear that the term multi-threading is used in its ordinary, generally understood sense. And he previously identified six references that he said set forth that ordinary, generally understood sense of multi-threading. And the board went through an exhaustive review of those six references and concluded that multi-threading requires that a plurality more than one thread be interruptible. So wait, the language you were just talking about, so you're construing that as covering the editor as well. In other words, if the editor were to otherwise exceed the time-slice, it would be interrupted. The editor would have to be interruptible in order for it to be multi-threaded. If that answers your question. It would have to stop executing at the end of the time-slice and give control over to the CPU so the CPU can execute a different thread. Do editors typically run over a time-slice? I mean, what if we were to conclude that one skilled in the art would know that an editor never exceeds the time-slice? Would that change the way we should look at this? There's definitely substantial evidence in the record that editors can be interrupted. And I would refer you to the Didle reference where the discussion was in the context of interactive threads. And as Mr. Wright had said, an editor is an interactive thread. That reference is substantial evidence that interactive threads, including editors, must be interrupted. If a time-critical thread becomes available, it has to be interruptible. So there would be no problem with this disclosure if Mr. Wright had limited or clarified this paragraph to specifically differentiate between compilers and then editors, and the editors not necessarily being tied to the time-slice. Are you talking about the paragraph that we were talking about in the 604? Yes. Well, it would not be multi-threading. It would not be consistent with the ordinary generally understood definition. Mr. Pelosi said the term multi-threading, as used in this specification, means, and then described, a one-thread interruptible system, a la the editor-compiler of 82. Yes, and he could certainly have done that, Your Honor. And then this whole problem would go away. Well, this particular issue would not be here. The next issue that we would have to discuss is whether or not the 1982 embodiment discloses the full scope of multi-threading. As found in the claims? As found in the claims. I thought we'd have a more conventional priority-type issue, which is the specification is consistent with the 82 specification, but the claims go way beyond the scope of the specification, so it's not in the claims. Correct, Your Honor. You're right. And again, multi-threading can be applied in applications that do not include editor-compiler. And so the scope of multi-threading in general is much broader than that embodiment. Thank you, Your Honor. Thank you. Mr. Ryphon? My colleague's statement that Ryphon never argued that claim 10 separately is incorrect. In our principal brief, we devoted six pages to nothing but analysis of each and every limitation of claim 10. But I think what he said was you didn't argue that claim 10 should be treated separately before the board, not before us. The question is, did you accept the notion that claim 1 was a representative claim when you were before the board? No, we did not. We argued at length that claim 10 had these limitations. We referred every limitation in the claim to the specification, and we did nothing with respect to claim 1. Before the board? In our brief. No, I'm talking about before the board, not before us, but before the Board of Appeals and Interferences. I don't recall. Now, must an editor be interrupted is really the issue. There has never been, as far as anyone knows, in 27 years of litigating and prosecuting this case, an interruptible editor. They can't point to none. No one else has been able to point to one. An interruptible editor is almost a contradiction in terms. There are several reasons. But there are certainly, are there not, interruptible multi-threads in which more than one thread is interruptible on a time-slice driven basis, correct? There are, I guess, indeed. So it doesn't really matter for purposes of analyzing this patent and what the language of the new material in this patent means. It doesn't really matter, does it, whether editors and compilers are interruptible? The question is, have you put in a definition of multi-threading in 1994 that goes beyond what you disclosed in 1982? I think not. Nowhere in the 82 or 604 patent, the application or the patent, is there a claim that the editor is interrupted? Is there a disclosure that the editor is interrupted? On the contrary, the specification states quite clearly that the editor is not interrupted, that the editing operation is disabled during the running of the editor, and there can't possibly be an interruption of the editor, which was the whole point made by the examiner. Now, there is nothing that says, all threads must be interruptible. That is a fiction. There are many instances of multi-threading where no thread is interruptible, including the one example in France. He has two threads, neither one is interruptible. And furthermore, the thread that corresponds most closely to the editor is his keyboard input thread, which completes, and that is synonymous with finishes. So, if the 1982 application and or the 604 patent are deficient in that respect, and so is Kranz, and all of the references, rather all of the rejections, on 102 and 103 are untenable, because Kranz shows two threads, neither one of which is interruptible, and then neither one is any different from the alleged defect relied upon by the director. So, you can't have it both ways. If Kranz is multi-threading, then the 1982 application is multi-threading. Okay? Thank you very much, Mr. Wright. Thank you. Issue submitted. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock AM. The Silence. Silence.  Silence.